[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 5, 2010
JOHN LEY
CLERK

_____

No. 08-15809

_____

D. C. Docket No. 05-01460-CV-T-17-TGW

UNDERWRITERS AT LLOYD'S, LONDON,

                                        Plaintiff-Counter-Defendant-Appellee,

versus

CAROL OSTING-SCHWINN,
as parent and legal guardian of C.O., a minor,

                                        Defendant-Counter-Claimant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(August 5, 2010)

Before MARCUS and HILL, Circuit Judges, and VOORHEES,* District Judge.

---

*Honorable Richard L. Voorhees, United States District Judge for the Western District of North Carolina, sitting by designation.

MARCUS, Circuit Judge:

At issue in this appeal is whether syndicates of insurance underwriters who do business in the international insurance marketplace known as Lloyd's of London ("Lloyd's") must plead the citizenship of each of their underwriting members to establish diversity jurisdiction pursuant to 28 U.S.C. § 1332. Faced with a state court negligence suit against one of their policy-holders, the Lloyd's syndicates filed the diversity action underlying this appeal, seeking a declaratory judgment that the lawsuit was barred by a prior settlement. Although the syndicates disclosed only the "lead underwriter's" citizenship, the district court denied the defendant's motion to dismiss for lack of subject matter jurisdiction. It then granted summary judgment for the plaintiff Underwriters on the settlement issue. The defendant challenges both rulings here, but the jurisdictional issue is dispositive. A wealth of Supreme Court precedent yields the conclusion that the Lloyd's syndicates, as unincorporated associations, must plead the citizenship of each of their members. Because the syndicates did not do so, they failed to establish diversity jurisdiction. We, therefore, reverse the judgment of the district court and remand the case for further proceedings consistent with this opinion.

I.

A.

The critical facts relevant to this appeal are drawn from the record on the Rule 12(b)(1) motion to dismiss and the Rule 56 motion for summary judgment. See Fed. R. Civ. P. 12(b)(1) and 56. On May 7, 2002, Carol Osting-Schwinn's minor son, C.O., was riding a dirt bike when it collided with an all-terrain vehicle driven by Michael Rockhill, who was insured by a policy underwritten at Lloyd's. C.O. sustained serious physical injuries and his mother filed an insurance claim. The relevant underwriting syndicates at Lloyd's became aware of the claim in the fall of 2004 and offered to settle it. On May 25, 2005, Osting-Schwinn's attorneys sent a settlement offer to the syndicates, offering to release all claims in exchange for a check for the full policy limits and the information disclosures required by Fla. Stat. § 627.4137. The syndicates accepted the settlement offer on May 31, 2005, sending four checks in the amount of the policy limits, along with affidavits and a copy of the Rockhills' policy intended to satisfy the disclosure requirements of the Florida statute.

After several letters between the syndicates and Osting-Schwinn's attorneys, however, Osting-Schwinn returned the settlement checks, claiming that the syndicates had failed to properly disclose information about other known insurers and to send an adequate copy of the insurance policy, all in violation of Florida law. Osting-Schwinn then filed a negligence action on behalf of her son against

Michael Rockhill, Jr., and Michael Rockhill, Sr., in Florida Circuit Court in July 2005. Complaint, Osting-Schwinn v. Rockhill, Case No. 05-6257 (Fla. Cir. Ct. July 21, 2005). In response, the underwriting syndicates commenced this diversity action in the United States District Court for the Middle District of Florida on August 5, 2005, seeking a declaratory judgment pursuant to 28 U.S.C. § 2201 that the parties had reached a valid settlement.[1] The syndicates twice amended their complaint to address issues of citizenship for purposes of diversity jurisdiction. Those issues are at the heart of this appeal, but to understand them, we must detour briefly to examine the peculiar institutional structure of Lloyd's of London, the underwriters and syndicates that use it to broker insurance, and the structure of liability that it creates.

B.

The Society of Lloyd's, London, is not an insurance company, but rather a

---

[1] Each successive complaint referred to the plaintiffs vaguely as "Underwriters at Lloyd's, London." The Second Amended Complaint, for its part, drew special attention to the identity and citizenship of the "lead underwriter," but made no attempt to explain the lead underwriter's relationship to the other plaintiff underwriters -- for example, whether the lead underwriter had some special status in the lawsuit among the amalgam of unspecified "Underwriters." Second Amended Complaint at 2, ¶ 2, Underwriters at Lloyd's, London v. Osting-Schwinn, No. 8:05-CV-1460 (M.D. Fla. Nov. 18, 2005). From the face of the complaint, therefore, it was unclear whether the plaintiffs were (1) merely a number of separate underwriters, each of whose citizenship would have to be examined, (2) a lead underwriter appearing as an agent for all of the members, or as an agent for the underwriting syndicates, or (3) the syndicates themselves. Later, however, the plaintiffs' designated representative, Colin Miller, testified that the phrase "Underwriters at Lloyd's, London" referred in this instance to the three syndicates whose members were responsible for underwriting the Rockhills' policy. We therefore proceed with the understanding that the plaintiffs here are indeed the syndicates.

4

British organization that provides infrastructure for the international insurance market. Originating in Edward Lloyd's coffee house in the late seventeenth century, where individuals gathered to discuss insurance, the modern market structure was formalized pursuant to the Lloyd's Acts of 1871 and 1982. Lloyd's Act, 1871, 34 Vict., c. 21, pmbl.; Lloyd's Act, 1911, 1 & 2 Geo. V, c. 62; Lloyd's Act, 1951, 14 & 15 Geo. VI, c. 8; Lloyd's Act, 1982, c. 14. Lloyd's itself does not insure any risk. Individual underwriters, known as "Names" or "members," assume the risk of the insurance loss. Names can be people or corporations; they sign up for certain percentages of various risks across several policies. Once admitted to the Society of Lloyd's, each Name is subject to a number of bylaws and regulations ensuring that he or she is solvent and "that at all times there are available sufficient funds" to pay all claims. See, e.g., Lloyd's Act, 1982, c. 14 § 8. Critical to the diversity jurisdiction question, Names are not only British citizens, but may be of many nationalities. Lloyd's Act, 1982, c. 14, pmbl. (5).

Names underwrite insurance through administrative entities called syndicates, which cumulatively assume the risk of a particular policy. In this case, syndicates 861, 1209, and 588 subscribe to the Rockhills' policy. The syndicates are not incorporated, but are generally organized by Managing Agents, which may or may not be corporations. The Managing Agents determine the underwriting

5

policy for the syndicate and accept risks on its behalf, retaining a fiduciary duty toward the underwriting Names. As mere administrative structures, the syndicates themselves bear no risk on the policies that they underwrite; the constituent Names assume individual percentages of underwriting risk. The Names are not liable for the risks that the other Names assume. Lloyd's Act, 1982, c. 14 § 8(1). Names purchase insurance through underwriting agents. Lloyd's Act, 1982, c. 14 § 8(2).

Lead underwriters, or active underwriters, serve as the public faces for particular syndicates. In this case, the lead underwriter is Dornoch, Ltd. Second Amended Complaint at 2, ¶ 2, Underwriters at Lloyd's, London v. Osting-Schwinn, No. 8:05-CV-1460 (M.D. Fla. Nov. 18, 2005). This underwriter is usually the only Name disclosed on the policy, although the Lloyd's Policy Signing Office keeps records on the identity of each Name underwriting a policy. In the event of a suit over a Lloyd's policy, the lead underwriter is often named specifically in the suit. See, e.g., E.R. Squibb & Sons, Inc. v. Accident & Cas. Ins. Co., 160 F.3d 925 (2d Cir. 1998) (naming Allan Peter Dennis Haycock, lead underwriter, in the suit); Hilton Oil Transport v. Jonas, 75 F.3d 627 (11th Cir. 1996) (naming lead underwriter T.E. Jonas in a suit over marine insurance).

Crucially, each Name's liability is several and not joint. Thus, the Lloyd's Act of 1982 provides that an "underwriting member shall be a party to a contract of

6

insurance underwritten at Lloyd's only if it is underwritten with several liability, each underwriting member for his own part and not one for another, and if the liability of each underwriting member is accepted solely for his own account." Lloyd's Act, 1982, c. 14, § 8(1).  See also Lloyd's Act, 1871, c. 14 § 40 ("Nothing in this Act shall confer limited liability on the members of the Society, or in any manner restrict the liability of any member thereof in respect of his individual undertakings, or make any member of the Society as such responsible in any manner for any of the undertakings, debts, or liabilities of any other member of the Society as such, or affect or interfere with or empower the Society or the Committee to interfere with any business whatever other than the business of insurance carried on by any member of the Society.").  Through contractual agreement, the other Names that are members of the underwriting syndicates on the policy remain liable for their proportional share of any adverse judgments.  As is typical, the Rockhills' contract has a provision explaining that "in any suit instituted against any one of them upon this contract, Underwriters will abide by the final decision of such Court or of any Appellate Court in the event of an appeal."  Thus, the legal relationship between the Names and the insured is a vertical one: it is the individual Names, not the syndicate, who are directly liable in the event of loss, as if each Name had a contract with the insured.

C.

The Lloyd's syndicates' first complaint in this case asserted that "[t]his is an action based upon diversity of citizenship brought by Underwriters against Carol Osting-Schwinn for specific performance of a contract . . . ." Complaint at 1, Underwriters at Lloyd's, London v. Osting-Schwinn, No. 8:05-CV-1460 (M.D. Fla. Aug. 5, 2005). The initial complaint did not include any information about the plaintiffs' citizenship. The first amended complaint again claimed diversity jurisdiction, but this time included the following information identifying the plaintiff: "Underwriters subscribe to policy number UT01AS83, issued under Certificate number LLMH00447, the named insured of which is Rockhill. Underwriters are citizens of the United Kingdom." Amended Complaint at 2, Underwriters at Lloyd's, London v. Osting-Schwinn, No. 8:05-CV-1460 (M.D. Fla. Oct. 18, 2005). Finally, the second amended complaint added information about the lead underwriter's citizenship: "The lead underwriter, Dornoch Ltd., is a company incorporated under the laws of the United Kingdom and having its principal place of business at 70 Gracechurch Street in London, England." Second Amended Complaint at 2, Underwriters at Lloyd's, London v. Osting-Schwinn, No. 8:05-CV-1460 (M.D. Fla. Nov. 18, 2005).

Osting-Schwinn then moved, pursuant to Fed. R. Civ. P. 12(b)(1), to dismiss

8

the case for lack of subject matter jurisdiction, based on the syndicates' failure to plead the citizenship of each underwriting Name. The district court denied the motion, relying on Certain Interested Underwriters at Lloyd's, London, England v. Layne, 26 F.3d 39, 42 (6th Cir. 1994), for the proposition that the lead underwriter, as an "agent[] for [an] undisclosed principal[]," is the "real party to the controversy" and, therefore, can establish diversity jurisdiction on the basis of its citizenship alone. Underwriters at Lloyd's, London v. Osting-Schwinn, No. 8:05-CV-1460-17TGW, 2006 WL 947815 at *2 (M.D. Fla. Apr. 12, 2006). The district court described Lloyd's as consisting of "over 400 separate syndicates and over 30,000 members," and reasoned that disclosing the citizenship of "all underwriters at Lloyd's" would be "unwieldy." Id. The district court also observed that, given the Lloyd's policy against disclosing the Names' identities, disclosure would prevent Lloyd's from vindicating its rights in federal court.[2] Id. Finally, the district court noted that "federal and state courts have allowed

---

[2] Although Lloyd's of London is not an insurer but an organization that effectively facilitates an insurance market, some courts and commentators occasionally have used the term "Lloyd's" as shorthand for the underwriters, who frequently appear in court either through their respective syndicates or through the lead underwriter representing the syndicates' members. This shorthand contributes to the confusion that already abounds in the area, since Lloyd's, which has its own distinct identity and legal status as a British market facilitator, is generally not a party to insurance proceedings such as the one in this case. That is, Lloyd's does not seek in an action such as this one to "vindicate its rights" in federal court. Rather, it is the underwriters who trade on the Lloyd's market, and who appear in court in the form of syndicates, that seek to do so.

9

numerous cases to proceed in which Underwriters at Lloyd's, London was a party,"
and that the Florida legislature had "acknowledged Lloyd's importance in
commerce by declaring them a person under the Florida Insurance Code § 624.04."
Id.

Thereafter, on September 30, 2008, the district court granted the
underwriting syndicates' motion for summary judgment, holding that they and
Osting-Schwinn had formed an enforceable out-of-court settlement, directing the
Underwriters to disburse $101,658 to settle the claim, and directing Osting-
Schwinn to execute a General Release of All Claims. Underwriters at Lloyd's,
London v. Osting-Schwinn, No. 8:05-CV-1460-17TGW, 2008 WL 4459016 at *4
(M.D. Fla. Sept. 30, 2008).

## II.

We review de novo a district court's denial of a Rule 12(b)(1) motion to
dismiss for lack of subject matter jurisdiction. Sinaltrainal v. Coca-Cola Co., 578
F.3d 1252, 1260 (11th Cir. 2009). In this case, we review de novo whether the
district court properly interpreted and applied the provisions of 28 U.S.C. § 1332 in
determining whether the underwriters at Lloyd's established diversity jurisdiction.
See Amos v. Glynn County Bd. of Tax Assessors, 347 F.3d 1249, 1255 (11th Cir.
2003). We review the district court's jurisdictional fact-findings, however, for

clear error.  Id.  The clearly erroneous standard is "highly deferential" and requires

that we uphold the district court's factual determinations so long as they are

"plausible in light of the record viewed in its entirety." Carmichael v. Kellogg,

Brown & Root Servs., Inc., 572 F.3d 1271, 1280 (11th Cir. 2009) (internal

citations and quotation marks removed).

For federal diversity jurisdiction to attach, all parties must be completely

diverse, Strawbridge v. Curtiss, 7 U.S. (3 Cranch) 267, 267 (1806); Palmer v.

Hosp. Auth. of Randolph County, 22 F.3d 1559, 1564 (11th Cir. 1994); Tardan v.

Cal. Oil Co., 323 F.2d 717, 721-22 (5th Cir. 1963),[3] and the amount in controversy

must exceed $75,000, 28 U.S.C. § 1332(a).[4]  The party commencing suit in federal

court -- in this case, the underwriting syndicates at Lloyd's -- has the burden of

establishing, by a preponderance of the evidence, facts supporting the existence of

federal jurisdiction.  See Fed. R. Civ. P. 8(a)(1); McCormick v. Aderholt, 293 F.3d

---

[3] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent the decisions of the former Fifth Circuit rendered before the close of business on September 30, 1981.

[4] 28 U.S.C. § 1332 provides, in relevant part, that,

(a) The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between--
 . . .
(2) citizens of a State and citizens or subjects of a foreign state;
(3) citizens of different States and in which citizens or subjects of a foreign state are additional parties . . . .

1254, 1257 (11th Cir. 2002).

This appeal turns principally on the citizenship requirement. The underwriting syndicates at Lloyd's have for some years assumed that they are permitted to sue and be sued in federal court without disclosing the citizenship of their member Names, and they have had some success in this. We, nevertheless, must determine whether that practice comports with federal law governing diversity jurisdiction. As courts of limited jurisdiction, we are obliged to "scrupulously confine [our] own jurisdiction to the precise limits which the statute has defined." Healy v. Ratta, 292 U.S. 263, 270 (1934). We turn, then, to the central issue of whether the Lloyd's syndicates in this case could properly invoke the district court's diversity jurisdiction without pleading the citizenship of each of their member Names.

For well over a century, federal law has drawn a sharp distinction between corporations and virtually every other form of association for purposes of determining diversity of citizenship. On the one hand, corporations are considered legal persons whose citizenship does not depend on that of their shareholders, a rule that extends back at least to the case of Louisville, Cincinnati, and Charleston Railroad Co. v. Letson, 43 U.S. (2 How.) 497, 557-58 (1844). See also MacGinnitie v. Hobbs Group, LLC, 420 F.3d 1234, 1239 (11th Cir. 2005). On the

12

other hand, unincorporated associations do not themselves have any citizenship, but instead must prove the citizenship of each of their members to meet the jurisdictional requirements of 28 U.S.C. § 1332.  Furthermore, no matter the particular features of an unincorporated entity, it has long been "[t]he tradition of the common law . . . to treat as legal persons only incorporated groups and to assimilate all others to partnerships," which must plead the citizenship of each member.  Puerto Rico v. Russell & Co., 288 U.S. 476, 480 (1933).

The Supreme Court reaffirmed this categorical approach in Carden v. Arkoma Associates, 494 U.S. 185 (1990), a diversity suit brought by an Arizona limited partnership against two Louisiana citizens.  Id. at 186.  The defendants claimed that one of the plaintiff's limited partners was a citizen of Louisiana, and therefore that complete diversity was lacking.  Id.  The plaintiff countered that the citizenship of its limited partners was irrelevant for diversity purposes, under two separate theories.  The partnership first argued that a limited partnership, like a corporation, should be considered a citizen of the state that created it.  Second, and more narrowly, the partnership said that federal courts should look only to the general partners rather than the limited partners for diversity purposes, since the general partners have exclusive managerial control over partnership operations.  Id. at 191, 192 (citation omitted).  The Supreme Court was unpersuaded by either

13

argument; responding to both, it squarely

> reject[ed] the contention that to determine, for diversity purposes, the citizenship of an artificial entity [other than a corporation], the court may consult the citizenship of less than all of the entity's members. We adhere to our oft-repeated rule that diversity jurisdiction in a suit by or against the entity depends on the citizenship of all the members.

Id. at 195-96 (citations and quotation marks omitted).

In support of its holding, the Court reviewed a long line of cases establishing the principle upon which it relied. See id. at 189-92. Thus, as early as its decision in Chapman v. Barney, 129 U.S. 677 (1889), the Court refused to extend the special treatment of corporations to other artificial entities. In Chapman, an unincorporated joint stock company sued as "a citizen of the state of New York," noting that it was "organized" under New York law. Id. at 679. The Supreme Court summarily rejected these allegations of diversity, holding that a joint stock company "cannot be a citizen of New York, within the meaning of the statutes regulating jurisdiction, unless it be a corporation." Id. at 682. A joint stock company, as the Court stated quite plainly, is "a mere partnership." Id.

Eleven years later, in Great Southern Fire Proof Hotel Co. v. Jones, 177 U.S. 449 (1900), the Court confronted a diversity suit filed by a Pennsylvania limited partnership that claimed it was a citizen of Pennsylvania. The partnership noted that it was organized under the laws of Pennsylvania, was entitled under

14

Pennsylvania law to sue and be sued in the name of the partnership, and was considered in Pennsylvania to be a "quasi corporation," with many of the features of a corporation.  Id. at 454-57.  The Supreme Court, however, still found Chapman to be "decisive," id. at 454, and held that none of the partnership's characteristics was "sufficient . . . for regarding it as a corporation within the jurisdictional rule" of Letson and its progeny.  Id. at 457.  "That rule," the Court said emphatically, "must not be extended."  Id.

Finally, in United Steelworkers of America, AFL-CIO v. R. H. Bouligny, Inc., 382 U.S. 145, 149-51 (1965), the Court addressed whether a national labor union could be treated as a citizen of the state where it had its principal place of business.  The district court could "[d]ivin[e] no common sense reason for treating an unincorporated national labor union differently from a corporation," id. at 146 (quotation marks omitted), and the Supreme Court, too, found "considerable merit" in the growing chorus of dissatisfaction with the Chapman approach:

> The distinction between the 'personality' and 'citizenship' of corporations and that of labor unions and other unincorporated associations, it is increasingly argued, has become artificial and unreal. The mere fact that a corporation is endowed with a birth certificate is, they say, of no consequence. In truth and in fact, they point out, many voluntary associations and labor unions are indistinguishable from corporations in terms of the reality of function and structure, and to say that the latter are juridical persons and 'citizens' and the former are not is to base a distinction upon an inadequate and irrelevant difference.

Id. at 149-50.  Nevertheless, the Supreme Court characterized the decision of how to treat unincorporated associations as primarily legislative in nature.  Id. at 147-53.  Noting the high degree of arbitrary line-drawing that would follow if the judiciary were left to determine which among the many artificial creatures of state law were sufficiently like a corporation to be treated as such for diversity purposes, id. at 152, the Court held steady on the course set by Chapman.

Adhering firmly to these precedents, the Court in Carden provided "a general rule: every association of a common-law jurisdiction other than a corporation is to be treated like a partnership."  Indiana Gas Co. v. Home Ins. Co., 141 F.3d 314, 317 (7th Cir. 1998) (emphasis in original) (citing Carden, 494 U.S. at 190).  That rule applies without regard to the corporation-like features or other business realities of the artificial entity.  Bouligny, 382 U.S. at 149-51.[5]  A federal

---

[5] The plaintiff partnership in Carden urged the Supreme Court to recognize an exception to the age-old rule concerning unincorporated associations, based on the Court's decision in Navarro Savings Association v. Lee, 446 U.S. 458 (1980).  In that case, the plaintiffs were eight individual trustees of a business trust, suing in their own names.  The defendant claimed that the trust beneficiaries, rather than the trustees, were the real parties to the controversy, and that the beneficiaries' citizenship should control.  Id. at 461-62.  As the Court later explained in Carden, however, the Navarro case "did not involve the question whether a party that is an artificial entity other than a corporation can be considered a 'citizen' of a State, but the quite separate question whether parties that were undoubted 'citizens' (viz., natural persons) were the real parties to the controversy."  Carden, 494 U.S. at 191.  In essence, therefore, Navarro "has nothing to do with the Chapman question."  Id. at 191-92.

The only real exception to the Carden rule can be found in Puerto Rico v. Russell & Co., 288 U.S. 476, 480-82 (1933), where the Supreme Court held that Russell & Co., a "sociedad en comandita" formed under Puerto Rican civil law, could be treated as a citizen of Puerto Rico to establish federal diversity jurisdiction.  Some years later, however, in reaffirming the "doctrinal

16

court, therefore, may not avoid the Carden rule simply by characterizing one member of an unincorporated association as the only "'real party' to the controversy," an approach advocated by the dissent in Carden, 494 U.S. at 200 (O'Connor, J., dissenting), and explicitly rejected by the majority. Id. at 188 n.1, 195 (majority opinion).

The Supreme Court acknowledged the formal nature of the rule it endorsed in Carden, but echoed its earlier assessment in Bouligny that the issue of how to treat associations under § 1332 was primarily a legislative one: "[H]aving entered the field of diversity policy with regard to artificial entities once (and forcefully) in Letson, we have left further adjustments to be made by Congress." Id. at 196 (citing Bouligny, 382 U.S. at 147). Moreover, whatever the strength of its substantive rationale, the Carden rule avoids the potentially serious "difficulty of creating and applying a workable standard to determine which unincorporated associations possess sufficient 'entity' characteristics to be treated as corporations for diversity purposes." 13F Charles Alan Wright, Arthur R. Miller & Edward H.

_____

wall" between incorporated and unincorporated entities, the Supreme Court itself explained Russell as a case resolving the distinctive problem of fitting an exotic creation of the civil law into a federal scheme which knew it not. There could be no doubt that at least common-law entities (and likely all entities beyond the Puerto Rican sociedad en comandita) would be treated for purposes of the diversity statute pursuant to what Russell called the tradition of the common law, which is to treat as legal persons only incorporated groups and to assimilate all others to partnerships.

Carden, 494 U.S. at 190 (quotation marks, citations, and alterations omitted).

17

Cooper, Federal Practice and Procedure § 3630 (3d ed. 2009). In other words, the Carden rule has the distinct advantages of all bright-line rules: predictability and ease of application.

In this case, the Carden rule clearly and neatly answers the jurisdictional question we face. The Lloyd's syndicates who are the plaintiffs in this case, classed as "Underwriters," fall squarely within the class of unincorporated associations for which the pleading of every member's citizenship is essential to establishing diversity jurisdiction. Syndicates in the Lloyd's market have no independent legal identities, but are merely "creature[s] of administrative convenience," Corfield v. Dallas Glen Hills LP, 355 F.3d 853, 858 (5th Cir. 2003): they operate as an aggregation of individual members with individual contracts and obligations running to the insured. They are organized by a Managing Agent and the lead underwriter, but the Managing Agent is merely a fiduciary with no financial stake, and the lead underwriter, despite typically having a greater financial stake and some managerial responsibility, is ultimately just one among the syndicate's multiple underwriters, all of whom are severally liable to the policy holder for their respective share of the risk. Both legally and structurally, the Lloyd's syndicates are classic examples of unincorporated associations; they are "bod[ies] of persons acting together, without a charter, but upon the methods and

18

forms used by corporations, for the prosecution of some common enterprise."

Penrod Drilling Co. v. Johnson, 414 F.2d 1217, 1222 (5th Cir. 1969) (citation and quotation marks omitted).  See also Prewitt Enters., Inc. v. Org. of Petroleum Exporting Countries, 353 F.3d 916, 921 n.6 (11th Cir. 2003).  Thus, whatever the syndicates' peculiar characteristics, Carden unambiguously requires that they plead the citizenship of each of their member Names.

In holding that syndicates of Lloyd's underwriters must plead the citizenship of each of their members, we join two of our sister circuits.  Faced with the same question we face here, the Seventh Circuit concluded as follows:

> An underwriting syndicate at Lloyd's has the personal-liability characteristics of a general partnership and the management structure of a limited partnership.  It is not incorporated and does not have the structure of a trust . . . [T]he names are natural persons and sole traders, subscribing to policies of insurance each for his or her own part and not one for the other.  They are members of various syndicates. General partnerships, limited partnerships, joint stock companies, and unincorporated membership associations all are treated as citizens of every state of which any partner or member is a citizen.  It follows that the underwriting syndicates have the citizenships of every name.

Indiana Gas Co., 141 F.3d at 317 (citing Carden, Bouligny, and Chapman) (internal citations and quotation marks omitted).  The Seventh Circuit also rejected the claim that the lead underwriter was analogous to a trustee, and therefore the appropriate party from which to determine jurisdiction: as the court explained, the

19

underwriters "do not own [the syndicate's] wealth or exercise over it any dominion other than the power to underwrite risks." Id. at 318 (citing Navarro, 446 U.S. at 465). The Second Circuit has reached a similar conclusion. See E.R. Squibb, 160 F.3d at 931.[6]

Only one circuit has reached the opposite conclusion. In Certain Interested Underwriters at Lloyd's, London, England v. Layne, the Sixth Circuit held that lead underwriters suing in a representative capacity could establish diversity jurisdiction based on their own citizenship because they were the real parties in interest in the insurance dispute. 26 F.3d 39, 43-44 (6th Cir. 1994). The Sixth Circuit identified the lead underwriters as the real parties in interest because they were "liable on the contract. They actually wrote the insurance, processed the claim, and are authorized to sue on the policy." Id. at 43 (quotation marks omitted).

---

[6] The Second Circuit employed a different analysis, endorsing much of the reasoning in Indiana Gas, but framing the question as whether a lead underwriter could sue as an agent for the other underwriters, whose citizenship remained undisclosed. With the question so framed, the Second Circuit largely avoided discussion of Carden and the rules concerning the treatment of unincorporated associations. Rather, the court held that the lead underwriter, as a representative, failed to come within an exception to the "general rule . . . that federal courts must look to the individuals being represented rather than their collective representative to determine whether diversity of citizenship exists." E.R. Squibb, 160 F.3d at 931-34 (noting that citizenship of represented individuals can be ignored in favor of representative's citizenship only in the case of corporations, trusts represented by a trustee, and class action members represented by a class representative). Analytically, the Second Circuit's approach is very similar to the one we take in this case. The distinction is that here, the plaintiffs are the unincorporated syndicates themselves, so that Carden provides the applicable doctrinal rule.

20

Even if we agreed with the Sixth Circuit that the lead underwriters are somehow more the real parties in interest than the Names they represent -- a flawed premise, as we see it, since each underwriter is directly liable for his proportionate share of the risk, and only for that share -- we would still reject the Sixth Circuit's approach because it relies on an incorrect reading and application of Carden. Principally, the Layne decision rested on the argument contained in the dissent in Carden that identifying the "real party in interest" is sufficient to determine citizenship. Indeed, in explaining that the diversity question "is generally answered by application of the 'real party to the controversy' test," id. at 42, the Layne court cited a footnote in Carden in which the majority rejected the application of the real-party-in-interest test to artificial entities. The cited footnote criticized the dissent's approach, noting that the "dissent fails to cite a single case in which the citizenship of an artificial entity, the issue before us today, has been decided by application of the 'real party to the controversy' test that it describes." Carden, 494 U.S. at 188 n.1. The Sixth Circuit, for its part, offered little explanation of how the "real party in interest" test could properly be used to circumvent the rule in Carden in a case such as this one. Cf. 13F Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3630.1 (3d ed. 2009) ("The majority view, articulated in the Seventh Circuit's

21

Indiana Gas decision[,] appears more consistent [than does Layne] with the general rule, re-articulated in Carden, that the citizenship of each member of an unincorporated association . . . must be considered in determining whether diversity of citizenship exists.").

We note that in taking jurisdiction in this case, the district court relied primarily on Layne. But we remain unpersuaded by the district court's approach for the same reasons we reject the approach taken in Layne. The district court did make three additional observations in support of its conclusion, but we cannot agree with them either. First, the district court said that "alleg[ing] complete diversity would . . . be an unwieldy burden" and would shut Lloyd's out of federal court because Lloyd's would be required to disclose the identity and citizenship of every Name on the Lloyd's market. Underwriters at Lloyd's London v. Osting-Schwinn, 2006 WL 947815, at *2 (M.D. Fla. Apr. 12, 2006). The rule of Carden, however, is "technical, precedent-bound, and unresponsive to policy considerations raised by the changing realities of business organization," and does not admit of exceptions based on convenience or practicality. Carden, 494 U.S. at 196. And, even if legally relevant to the jurisdictional inquiry, the "unwieldiness" principle is based on a clearly erroneous finding of fact: each syndicate comprises only those Names that subscribe to a particular policy, and who are liable on that policy; it is

22

therefore only those subscribing Names that would have to be disclosed, not, as the district court assumed, all of the approximately 30,000 Names in the Lloyd's market.

Second, the district court observed that the lead underwriters are "liable for the entire amount [of an insurance policy] as a matter of law." Underwriters at Lloyd's, 2006 WL 947815, at *2. Again, however, even if legally relevant, this determination is wrong, because the lead underwriters are only severally liable, like the other Names, for their proportional amount of loss. See Lloyd's Act, 1982, c. 14, § 8(1). See also Corfield, 355 F.3d at 858-59; Squibb, 160 F.3d at 928-29.

Finally, the district court noted that Florida law has "declar[ed] [Lloyd's] a person under the Florida Insurance Code § 624.04," which the district court considered a "recognition of Lloyd's ability to bring suit." Underwriters at Lloyd's, 2006 WL 947815, at *2. This reasoning is perplexing. As an initial matter, it is the underwriters, not Lloyd's, who are the parties to this lawsuit. Lloyd's of London is not suing anyone in this insurance dispute, nor can we imagine why it should do so. Second, the district court's reasoning is squarely foreclosed by our case law and that of the Supreme Court. "[A]n association has no legal existence as an entity separate from its members[,] . . . [and] is not a jural person for purposes of diversity jurisdiction, even when it has the capacity to sue

23

or be sued in the association name" under state law. Calagaz v. Calhoon, 309 F.2d 248, 251-52 (5th Cir. 1962) (emphasis added). See also Great Southern, 177 U.S. at 454-57 (holding that a limited partnership association that was given the ability to sue and be sued in its own name under state law was not a citizen of that state for diversity purposes). Indeed, § 624.04 of the Florida Statutes also defines a "partnership" as a "person," but no one could reasonably contend that to determine a partnership's citizenship "for diversity purposes, . . . [a] court may consult the citizenship of less than all of the entity's members." Carden, 494 U.S. at 195 (rejecting precisely that contention). In other words, associations may enjoy any number of peculiar rights under state law, but in determining diversity jurisdiction, "[t]he dead hand of the common law still holds unincorporated associations in its grip." Calagaz, 309 F.2d at 251.

Although we conclude that a Lloyd's syndicate must plead the citizenship of each Name to establish diversity jurisdiction, we address one final possibility by which jurisdiction might be salvaged here. Several circuits have held that because of the Names' several liability, an individual Name that meets the amount in controversy requirement may proceed in his individual capacity. See Corfield, 355 F.3d at 864; Chem. Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co., 177 F.3d 210, 222-23 (3d Cir. 1999); E.R. Squibb, 160 F.3d at 939-40. As an initial matter,

24

we are inclined to agree with this approach.

Several liability is fundamental to the Lloyd's structure and, as we've noted, is expressly provided for by statute; both the Lloyd's Act of 1871 and the Lloyd's Act of 1982 underscore that each Name is liable solely for his own proportional risk on a Lloyd's contract: "An underwriting member shall be a party to a contract of insurance underwritten at Lloyd's only if it is underwritten with several liability, each underwriting member for his own part and not one for another, and if the liability of each underwriting member is accepted solely for his own account." Lloyd's Act, 1982, c. 14, § 8(1). See also Lloyd's Act, 1871, c. 12 § 40. Accordingly, each underwriter has an independent stake in the insurance contract that stands apart from the liabilities of the other underwriters of the contract. For that reason, if an individual underwriter, proceeding in his individual capacity, satisfied the amount in controversy requirement, another underwriter's citizenship would not seem to be determinative, regardless of the practical effects that a judgment for or against that underwriter might have on other underwriters subscribing to the same policy. See, e.g., Squibb, 160 F.3d at 937; Chem. Leaman, 177 F.3d at 222-23.

We, nevertheless, need not decide how to treat an underwriter proceeding on his own behalf, because even if Dornoch Ltd. intended to sue in an individual

25

capacity, it has not made that intention clear, and therefore has not carried its burden of establishing subject matter jurisdiction. See McCormick, 293 F.3d at 1257. In fact, the operative complaint seems to suggest just the opposite -- that Dornoch was proceeding in a representative capacity:

> Nature of the Action
> 1. This is an action based upon diversity of citizenship brought by Underwriters against Carol Osting-Schwinn for specific performance of a contract to settle a liability claim set forth by the Defendant against Michael Rockhill, Sr. ("Rockhill"), the holder of a policy of liability insurance issued by Underwriters.
>
> Parties
> 2. Underwriters subscribe to policy number UT01AS83, issued under Certificate number LLMH00447, the named insured of which is Rockhill. The lead underwriter, Dornoch Ltd., is a company incorporated under the law of the United Kingdom and having its principal place of business at 70 Gracechurch Street in London, England.

The first sentence in the quotation identifies the plaintiffs as "Underwriters," in the aggregate, and then refers to Dornoch as the "lead underwriter," at least suggesting that Dornoch is representing the other unidentified underwriters. All we can say, however, is that the pleading is wholly ambiguous as to the role of Dornoch, and thus cannot establish diversity on the basis of Dornoch's individual citizenship.

Ultimately, "a remand [is] clearly . . . required in this suit as currently constituted, since the record does not disclose the identity, let alone the citizenship, of the Names involved in the case. And without knowledge of that citizenship, it

26

[is] impossible to say that complete diversity exists." E.R. Squibb, 160 F.3d at 930. Although Dornoch's citizenship has been revealed, until the other Names' citizenship has been shown -- or, perhaps, until the complaint is amended to state that Dornoch is proceeding in its individual capacity -- the district court could not properly find, by a preponderance of the evidence or otherwise, that the parties are completely diverse. "[O]nce a federal court determines that it is without subject matter jurisdiction, the court is powerless to continue." Univ. of S. Ala. v. Am. Tobacco Co., 168 F.3d 405, 410 (11th Cir. 1999).[7]

## III.

In short, the district court should not have continued past the jurisdictional threshold in this matter. Accordingly, we reverse the judgment of the district court, vacate the summary judgment order it entered in favor of the Underwriters, and remand the case for further proceedings consistent with this opinion. On remand, the district court should afford the Underwriters a further opportunity to revise their complaint to establish complete diversity of citizenship. The district court should also consider whether, under the revised complaint, the Underwriters have

---

[7] Osting-Schwinn has also argued that the Underwriters cannot meet the amount-in-controversy requirement of 28 U.S.C. § 1332(a), but we cannot address that argument here, because we do not know the exact composition of the syndicates or how much risk any one Name has assumed. Furthermore, inasmuch as jurisdiction has not been established, we lack the power to decide whether the parties in this case reached a valid settlement agreement that would preclude Osting-Schwinn's claims.

27

met the amount in controversy requirements under 28 U.S.C. § 1332(a).[8]

**REVERSED IN PART, VACATED IN PART, AND REMANDED**.

---

[8] See, e.g., Morrison v. Allstate Indem. Co., 228 F.3d 1255, 1262 (11th Cir. 2000) ("Generally, if no single plaintiff's claim satisfies the requisite amount in controversy, there can be no diversity jurisdiction. However, there are situations in which multiple plaintiffs have a unified, indivisible interest in some common fund that is the object of litigation, permitting them to add together, or 'aggregate,' their individual stakes to reach the amount in controversy threshold.") (citing Zahn v. Int'l Paper Co., 414 U.S. 291, 295 (1973)).

HILL, Circuit Judge, concurring:

We are bound, of course, by the holdings of the Supreme Court. *See, e.g., Carden v. Arkoma Associates*, 494 U.S. 185 (1990); *United Steelworkers of America, AFL-CIO v. R. H. Bouligny, Inc.*, 382 U.S. 145, 149-51 (1965); *Chapman v. Barney*, 129 U.S. 677 (1889). I cannot yield to the temptation to find this case not controlled by earlier Supreme Court precedent.

I concur.