**UNITED STATES EX REL. Chester SALDIVAR, Plaintiff,**

v.

**FRESENIUS MEDICAL CARE HOLDINGS, INC., Defendant.**

**CIVIL ACTION NO. 1:10–CV–01614–AT**

United States District Court, N.D. Georgia, Atlanta Division.

Signed October 30, 2015

Neeli Ben–David, U.S. Attorney's Office, Andrea Solomon Hirsch, Herman Gerel, LLP, Atlanta, GA, Christopher V. Tisi, Melissa A. Roover, Nathan M. Peak, Jamie M. Bennett, Ashcraft & Gerel, LLP, Landover, MD, Jason Marcus, Bracker & Marcus LLC, Marietta, GA, Julie K. Bracker, Mike Bothwell, The Bothwell Law Group, P.C., Roswell, GA, Sidney Schupak, Ashcraft & Gerel, LLP, Alexandria, VA, for Plaintiff.

Edward L. Dowd, Jr., James F. Bennett, James G. Martin, Lisa S. Hoppenjans, Megan Heinsz, Dowd Bennet, LLP, St. Louis, MO, Juanita Rose Brooks, Fish & Richardson, San Diego, CA, Joseph Matthew Maguire, Jr., Parks Chesin & Walbert, P.C., Atlanta, GA, for Defendant.

## ORDER

Amy Totenberg, United States District Judge

In this *qui tam* action, Relator alleges that Defendant violated the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*, by engaging in a fraudulent billing scheme in which Defendant received a certain portion of the medication it ordered from manufacturers for free, it administered that allegedly free medication to dialysis patients, and then it sought reimbursement from Medicare for the free medication it administered. Defendant moves to dismiss the lawsuit under two statutory provisions that circumscribe the Court's jurisdiction.

Defendant has styled its Motion as a Motion to Dismiss for lack of subject matter jurisdiction [Doc. 215]. Defendant filed a very similar motion back in July of 2011. The Court dismissed it and found jurisdiction to be proper based on the allegations in the Complaint. (Doc. 57.) The parties then engaged in discovery, during which Relator's deposition was taken on November 16, 2012. Almost two and a half years have lapsed between Relator's deposition and Defendant's filing this Motion, which is a factual challenge to the Court's jurisdiction based mostly on the November 2012 deposition.[1]

Defendant argues that both the Public Disclosure Bar and the First–to–File Bar apply to Relator's claims, thereby depriving the Court of subject matter jurisdiction

1. Defendant makes the veiled argument that the Eleventh Circuit's recent decision in *U.S. ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 812 (11th Cir.2015) constitutes "new legal authority" requiring the Court to take another look at its subject matter jurisdiction. Really what Defendant attempts is a second Rule 9(b) motion, questioning Relator's reliability rather than his original source status. "This guy?" Fresenius petitions the Court. "Really?" But, having been unsuccessful on its Rule 9(b) motion, (Doc. 57), Defendant now mounts a factual challenge to the Court's jurisdiction. "[I]t has long been well-established that the court's lack of subject matter jurisdiction may be asserted at any time by any interested party," Charles Allan Wright and Arthur R. Miller, 5B Fed. Prac. & Proc. Civ. § 1350 (3d ed.), at least in part because "subject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived." *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514, 126 S.Ct. 1235, 163 L.Ed.2d 1097 (2006) (quoting *United States v. Cotton*, 535 U.S. 625, 630, 122 S.Ct. 1781, 152 L.Ed.2d 860 (2002)).

to hear the case. The Court finds that neither applies. Public disclosure does not bar this suit because Relator is an original source of the information in his Complaint, and the only potentially preclusive earlier-filed suit was neither related nor pending. Accordingly, as explained below, Defendant's Motion is **DENIED**.

## I. LEGAL STANDARD

■ A motion to dismiss for lack of subject matter jurisdiction may be based on either a facial or factual challenge to the complaint. *See McElmurray v. Consol. Gov't of Augusta–Richmond County*, 501 F.3d 1244, 1251 (11th Cir.2007). The instant Motion is a factual attack. (Mot. Dismiss at 6.) A factual attack "challenge[s] 'the existence of subject matter jurisdiction in fact, irrespective of the pleadings.' " *Id.* (quoting *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990)). When addressing a factual attack, the trial court may proceed as it never could under 12(b)(6) or Fed.R.Civ.P. 56. Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction its very power to hear the case there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims. [In addition], the plaintiff [bears] the burden of proof that jurisdiction does in fact exist. *Lawrence*, 919 F.2d at 1529 (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir.1977)).

## II. BACKGROUND

The facts most relevant[2] to the issues before the Court are as follows. Chester Saldivar, the relator in this case, started working at Defendant Fresenius Medical Care Holdings, Inc. ("Fresenius") on April 1, 2007. (Deposition of Chester Saldivar at 11:13–21, Doc. 108–6.) While he eventually became the chief technician for two clinics—Mid Wilshire 2869 and East LA 3820—he was initially hired as an equipment technician assigned to those two clinics. (*Id.* at 15:19–16:8.) In the equipment technician role, Saldivar repaired dialysis machines, mixed chemicals, and did anything else the chief technician or clinic manager told him to do. (*Id.* at 16:2–16.)

Sometime in August, September, or October[3] of that year, Relator was asked to take responsibility for placing the orders for the two drugs at issue in this case, Epogen@ ("EPO") and Zemplar@ ("ZEM"), for his two clinics, and to transfer Epogen between the clinics whenever supply at a clinic was running low. (*Id.* at 30:12–23.) In addition to ordering both drugs, Saldivar was also asked by the chief technician in late 2007 to report the "Zemplar analysis." (*Id.* at 19:24–20:2.) Reporting the Zemplar analysis required Saldivar to fill out an inventory form that he submitted to Fresenius's Tempe office. (*Id.*) Saldivar filled out the form—a Microsoft Excel spreadsheet—by physically counting the vials on hand in the clinics, inputting the beginning-of-the-month vial count, the end-of-the-month vial count, and the dosages administered to patients during that month. (*Id.* at 75:10–18; 77:17–78:14.) Based on this information, the form automatically calculated and displayed the amount of overfill[4] utilized that

---

**2.** The facts of this case are long, complex, and detailed elsewhere. (*See, e.g.,* Doc. 144 at 3–13.)

**3.** The exact date on which Plaintiff began performing this function is unclear. (*See* Saldivar Dep. at 20:2–21:20.)

**4.** Overfill is a varying amount of extra medicine contained in individual vials, the purpose

month. (*Id.*) Relator completed the Zemplar analysis form for the rest of his tenure at Fresenius, though the overfill calculation was removed from the form as of December 2008. (*Id.* at 85.)

In September 2009, Relator began doing the inventory for Epogen as well. (*Id.* at 30:11–15.) The Epogen inventory form also included an overfill calculation, though Relator was only responsible for inputting the beginning and ending vial counts. (*Id.* at 150:20–151:8.) Relator knew that someone else—either a clinic manager, a secretary, or a nurse—was responsible for plugging in the number of doses administered. (*Id.* at 150:15–151:8.)

All told, Relator completed Zemplar inventory forms containing overfill calculations from August 2007 to December 2008, and he completed Epogen inventory forms from August or September of 2009 until his termination in December 2009. Two different supervisors told Relator that it was very important that he not make a mistake on those inventory forms because they were the basis of billing Medicare. (*Id.* at 39:17–40:6; 83:22–84:9.)

Inventory forms were not Relator's only job responsibilities related to, or his only interface with, overfill billing. In March 2008—one year into his almost 3–year tenure at Fresenius—Relator was promoted from equipment technician to chief technician. (*Id.* at 14:22–15:1.) In Saldivar's chief technician role, he was tasked with "achieving" the right amount of overfill, and his colleagues assured him they would assist him in his charge. (*Id.* at 161:6–9.)

Relator was also well aware of Fresenius's overfill policy because it was openly talked about in the office:

> The use of overfill was openly discussed by managers and nurses at Fresenius. It was a topic of conversation in part because the clinics were ranked

nationwide on overfill collection, and employees at clinics with the highest percentages of overfill with Fresenius' prescribed ranges were given bonuses. (Saldivar Decl. ¶ 8; *see also* Saldivar Dep. at 165:6–12 ("[O]ur goal [wa]s to achieve that overfill mark. Remember, we're competing in the ultra score [bonus structure]. We're trying to get that bonus. All clinics are trying to get that bonus. There's a ranking.").)

Relator was privy to the specifics of Fresenius's overfill policy by virtue of his chief technician position and his inventory duties. Relator explained that he and other Fresenius employees talked about the overfill policy "in clinical meetings. We talked about it in one-on-one conversations with managers. We talked about the monthly and quarterly report coming from corporate about the overfill." (*Id.* at 48:12–17.) Relator understood how effectively the policy was implemented across Fresenius's clinics nationwide because he was shown national reports as a result of his inventory-related functions:

> During my employment, Fresenius' corporate headquarters regularly sent monthly and quarterly reports to clinic supervisors reminding them of the company's overfill percentage goals and listing clinic performance nationwide in terms of overfill percentage for Epogen and Zemplar administered to patients. *Because I was charged with accounting for Zemplar and Epogen vials, I was shown these reports each month and quarter.*

(Saldivar Decl. ¶ 10 (emphasis added).)

Eventually, on December 18, 2009, Relator Chester Saldivar was terminated. Some months thereafter, he brought this lawsuit against Fresenius. The Third Amended Complaint, the operative com-

---

of which is to facilitate extraction of the la-

beled amount on the vial.

plaint in this action, contains four FCA claims against Fresenius:

- Count 1: Violation of the FCA for submitting false or fraudulent claims with respect to Zemplar overfill reimbursement and making false records or statements material to such claims.

- Count 2: Violation of the FCA by concealing or improperly avoiding or decreasing its own obligation to reimburse the Government for Zemplar overfill reimbursement as described in Count 1.

- Count 3: Violation of the FCA for submitting false or fraudulent claims with respect to Epogen overfill reimbursement and making false records or statements material to such claims.

- Count 4: Violation of the FCA by concealing or improperly avoiding or decreasing its own obligation to reimburse the Government for Epogen overfill reimbursement as described in Count 3.

Fresenius contends that its practice of utilizing overfill has been disclosed multiple times in multiple forms. Defendant points to three prior lawsuits, a 2004 Office of the Inspector General ("OIG") Report, a 2005 Department of Justice ("DOJ") subpoena, Fresenius's own SEC filings from 2005 through 2009, a 2008 article in a trade publication, and a number of financial analyst reports. These publications, and exactly what information they contained, will be addressed in more detail below as required.

## III. DISCUSSION

### A. Public Disclosure Bar

Defendant argues that the Court lacks subject matter jurisdiction to hear this case because the allegations upon which Relator's claims are based had been publicly disclosed before Relator filed his Complaint. Defendant also argues that Relator is not an original source for any of that information. Relator disagrees, contending not only that the specific allegations that Fresenius billed Medicare for free overfill had not been disclosed, but also that Relator is an original source of the information.

The FCA's Public Disclosure Bar ("PDB") was designed to "strike a balance between encouraging private persons to root out fraud and stifling parasitic lawsuits...." *Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson,* 559 U.S. 280, 295, 130 S.Ct. 1396, 176 L.Ed.2d 225 (2010). In striking that balance, Congress sought "the golden mean between adequate incentives for whistleblowing insiders with genuinely valuable information and discouragement of opportunistic plaintiffs who have no significant information to contribute of their own." *Id.* at 294, 130 S.Ct. 1396 (quoting *United States ex rel. Springfield Terminal R. Co. v. Quinn,* 14 F.3d 645, 649 (D.C.Cir.1994)).

The PDB that applies to Relator's claims[5] was codified at 31 U.S.C. § 3730(e)(4)(A) and (B) (2008). Those provisions read, in their entirety:

(A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional,

---

**5.** The 2010 amendments to the False Claims Act altered the language of the PDB. *See U.S. ex rel. Osheroff v. Humana Inc.,* 776 F.3d 805 (11th Cir.2015) (explaining various differences in the PDB between the pre-amendment Act and the amended Act). The pre-amendment Act applies in this case. (*See* Doc. 57 at 10 n.3.)

administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

(B) For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

■ The Eleventh Circuit dictates a three-step inquiry under the PDB: "(1) have the allegations made by the plaintiff been publicly disclosed; (2) if so, is the disclosed information the basis of the plaintiff's suit; (3) if yes, is plaintiff an 'original source' of that information." *McElmurray v. Consol. Gov't of Augusta–Richmond County,* 501 F.3d 1244, 1252 (11th Cir.2007) (quoting *Battle v. Bd. of Regents,* 468 F.3d 755, 762 (11th Cir. 2006)); *see also U.S. ex rel. Osheroff v. Humana Inc.,* 776 F.3d 805, 812 (11th Cir.2015) (describing same standard). As this test stems from footnote 4 in *Cooper v. Blue Cross & Blue Shield of Florida, Inc.,* 19 F.3d 562 (11th Cir.1994), it has come to be called the "*Cooper* test."

### 1. Publicly disclosed

Step 1 of the *Cooper* test requires the Court to determine whether the allegations in the Complaint were publicly disclosed. There is little question in this case that some similar factual allegations have been disclosed, at least in part.

■ Under the statute, a disclosure is public if it occurs "in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media." 31 U.S.C. § 3730(e)(4)(A). The sources of the information at issue here are unsealed filings in prior federal court litigation, federal government reports available to the public online; publicly available Securities and Exchange Commission ("SEC") filings, and publicly available industry reports. To the extent those documents are not marked as "confidential," [6] the Court accepts that the information contained therein was disclosed to the public. *See Osheroff,* 776 F.3d at 812 ("Before the 2010 amendments to the FCA, information disclosed in both federal and state court proceedings was considered publicly disclosed.") (citing *Graham Cnty.,* 559 U.S. at 283, 130 S.Ct. 1396.); *U.S. ex rel. Barber v. Paychex, Inc.,* No. 09–20990–CIV, 2010 WL 2836333, at *1 (S.D.Fla. July 15, 2010) (holding SEC Form 10–K filings are publicly disclosed documents), *aff'd sub nom. Barber v. Paychex Inc.,* 439 Fed.Appx. 841 (11th Cir. 2011); *U.S. ex rel. Alcohol Found., Inc. v. Kalmanovitz Charitable Found., Inc.,* 186 F.Supp.2d 458, 463 (S.D.N.Y.2002) ("This Court notes that the ordinary meaning of the statutory term 'news media,' would encompass the publication of information in scholarly or scientific periodicals. No different from newspaper reporters, scholarly and scientific authors also disseminate information to the public in a periodic manner."), *aff'd,* 53 Fed.Appx. 153 (2d Cir. 2002). The Court also finds that some of those public disclosures, described below, disclosed the allegations in this case that Fresenius engaged in a "nationwide scheme" to bill Medicare for Epogen and

---

6. The Court therefore does not consider the 2008 Citigroup Global Markets Document. (Doc. 237–3.)

Zemplar overfill that Fresenius received for free. (Doc. 147 ¶¶ 55, 66–68.)

### a. *Woodard*

 Defendant argues that Relator's allegations were disclosed in the second amended complaint in *U.S. ex rel. Ivey Woodard v. Fresenius Medical Care, A.G., DaVita, Inc., and John Does 1–20,* No. 1:02–CV–00252, Doc. 42 (E.D.Tex.2002). According to the *Woodard* docket, the second amended complaint was filed on March 3, 2005 and was unsealed on February 2, 2010 [7]—which means it was publicly accessible when the original complaint was filed in this case in March 2010. The second amended complaint, (Doc. 42–4 at 5–32), alleges that Fresenius [8] and others performed multiple acts that were prohibited by medical standards as well as federal, state, and local laws, and then certified that they were in compliance with all of those rules when they sought reimbursement from Medicare. The allegations in the second amended complaint include:

- Administering Epogen without regard to medical necessity or patient need, and in an off-label manner, by allowing Amgen salespeople, in violation of federal regulations, to view patient charts without patient consent and direct the clinic staff to administer Epogen in excess of the maximum amount permitted by the product information sheet, (*id.* ¶¶ 30–31);

- Maintaining a practice in which physicians would approve the above dosage alterations · without consulting patients' charts, (*id.* ¶ 34);

- Reporting to Medicare potentially false reasons· why excess Epogen was administered to a particular patient, (*id.* ¶ 36);

- Intravenous (rather than subcutaneous) administration of Epogen in a scheme to minimize the drug's efficiency and thus maximize the amount for which the companies could bill Medicare, (*id.* ¶¶ 39–49);

- Administering Epogen in an off-label and illegal manner by making multiple entries into single-entry Epogen vials to capture overfill, and then administering the overfill and billing Medicare for those additional doses "as if [the doses] came from new vials," (*id.* ¶ 56.);

- Billing Medicare for more Epogen than was actually administered, (*id.* ¶ 62);

- Obtaining rebates on Epogen orders from their Epogen supplier, Amgen, yet billing Medicare for the full amount paid, (*id.* at 24–25);

- Receiving kickbacks from Amgen including free anemia management and training support, free clinical and sales staff, and free entertainment funds, (*id.* ¶¶ 70–74);

- Obtaining rebates on Zemplar orders from their Zemplar supplier, Abbot Laboratories, yet billing Medicare for the full amount paid, (*id.* ¶¶ 78, 84);

- Making false representations to physicians in order to convince them to

---

7. Fresenius's Deputy General Counsel for Litigation, Ronald Castle, stated that the date of unsealing was July 2009. (Declaration of Ronald L. Castle ¶ 41, Doc. 42–2 at 18.) The docket sheet of the case shows otherwise.

8. Relator does not contest that Fresenius was the defendant in *Woodard.*

switch patients off other Vitamin D analogs and onto Zemplar, (*id.* ¶¶ 82–83); and

- Submitting claims for "unnecessary doses of Zemplar." (*Id.* ¶ 85.)

The *Woodard* allegations related to Zemplar do not disclose the allegations in this case. They do not discuss overfill at all. The *Woodard* allegations related to Epogen, and particularly the following paragraphs, come much closer, although they focus on Fresenius's violation of medical standards:

56. Since on or about 1992, Defendants instructed their employees to make multiple entries into single-use vials of Epogen to capture the overfill and these instructions may have been reduced to writing. *Defendants combined the overfill from multiple vials to form additional doses of Epogen, and the additional doses were billed to Medicare as if it came from new vials.*

57. Such multiple entries into single-use vials are a violation of standard medical practice, state law, and Medicare conditions of coverage for such, which require use of medications according to their labels and consistent with good medical practice. Multiple entries also pose a significant risk of infection to patients.

. . .

64. As a result of the above practices, [Fresenius] and DaVita have submitted and *have continued to submit* false claims for EPO to Medicare in substantial amounts per year.

(*Id.* (emphasis added).) *If* the context of the allegations provided by paragraph 57 and the remainder of the Complaint is stripped away or ignored, the italicized portion of paragraph 56 as well as para-

graph 64 can be read to allege simply that such Medicare overfill billing violated the FCA and continued through March 3, 2005, when the second amended complaint was filed.

### b. OIG Investigation—Epogen

■ Other public disclosures of billing Medicare for Epogen overfill are found in written communications relayed pursuant to a Corporate Integrity Agreement ("CIA") between Fresenius and the Office of the Inspector General ("OIG"). On January 18, 2000, Fresenius entered into the CIA, which lasted from 2000 through 2008 and was "designed to 'ensure compliance' by Fresenius and its subsidiaries, employees, contractors, and agents, 'with the requirements of Medicare, Medicaid and all other Federal health care programs." (Doc. 221–20 at 25–26.) The OIG Associate Counsel assigned to monitor Fresenius's compliance with the CIA was Nicole Caucci (formerly Nicole Hall).

Communications between Fresenius and Caucci, and Caucci's deposition testimony, show that Fresenius did not hide its overfill billing practices. For example, in an October 5, 2001 letter, Fresenius stated, "[i]nsofar as Epogen is billed to the Medicare program on the basis of units actually administered, the utilization of overfill amounts has no effect on facility reimbursement." (Doc. 221–21 at 5.)

Likewise, in a November 4, 2002 letter, Fresenius notified Ms. Caucci that it had "noted an increase in the reported amount of overfill recovered from Epogen vials by [its] dialysis clinics." (Doc. 221–23 at 171.) In particular, some clinics were reporting an average overfill of more than 16.8%— the target on average overfill contained in Epogen vials. "By itself," Fresenius explained, "an improvement in the Compa-

ny's average rate of overfill recovery would not raise regulatory concerns." (*Id.*) Fresenius acknowledged, however, that "improvements in overfill recovery" should not be "achieved at the expense of dosing accuracy." (*Id.*) Fresenius endeavored to determine the basis for increased overfill recovery and, in the meantime, voluntarily established an escrow account into which it would place a monthly estimate of revenue received from all payors that could be attributed to Epogen overfill in excess of 16.8%. (*Id.*) Ms. Caucci testified that she understood from this letter and the fact that Fresenius set up an escrow account devoted to funds associated with overfill billing that Fresenius was billing Medicare and other payors for Epogen overfill. (Deposition of Nicole Caucci at 69.)

Fresenius sent Ms. Caucci a follow-up letter in February 2003. The letter explained that Fresenius had not yet completed its analyses or reached any final conclusions regarding the reported overfill discrepancy. However, Fresenius notified Caucci that it established the escrow account for estimated revenue attributable to Epogen overfill in excess of 16.8% and was in the process of developing a procedure for monitoring the accuracy of overfill utilization using scientific scales. (Doc. 221–23 at 190–192.)

The next letter to Caucci, dated March 3, 2003, further confirmed Fresenius's utilization and billing for overfill. Fresenius's Senior Vice President John Markus explained the new Epogen monitoring program Fresenius had instituted and enclosed material describing this program.

(Doc. 221–24 at 2–10.) A critical aspect of the new program involved reducing the amount Fresenius billed Medicare for Epogen overfill amounts if the reported overfill amount exceeded 17%, which was below the 17.6 percent average overfill recently reported by Amgen. Markus explained, "Should the reported overfill exceed the maximum amount calculated from the measured sample, all billing for Epogen amounts from that facility for that day will be reduced on a pro rata basis prior to billing." (*Id.*) Caucci assumed, based on this disclosure, that Fresenius would continue this program throughout the life of the CIA—*i.e.*, though 2008—unless Fresenius notified her to the contrary. (Caucci Dep. at 79–80.) She did not recall Fresenius ever notifying her that it was discontinuing the program. (*Id.* at 79.) Under Step 1 of the *Cooper* test, the *Woodard* second amended complaint and the CIA communications publicly disclose the Epogen allegations.[9]

### c. OIG Investigation—Zemplar

Billing Medicare for Zemplar was also publicly disclosed in the OIG investigation. Another March 2003 letter to Ms. Caucci addressed billing Medicare for Zemplar overfill. (Doc. 221–24 at 12–13.) Here, David Kembel, Fresenius's Assistant General Counsel, explained that there was a "potential overpayment involving billings for Zemplar." (*Id.* at 12.) "In June, 2002," Kembel explained, "we became aware that a small number of FMCNA facilities were utilizing the overfill contained in vials of Zemplar. Upon further review, we determined that in some in-

9. Other public disclosures offered by Defendant imply that Fresenius billed Medicare for Epogen overfill. In particular, the SEC filings disclosed that Fresenius billed the government for administered Epogen and noted that a reduction in the amount of Epogen overfill in the vials supplied by the manufacturer could adversely affect business.

stances, this use of overfill could result in billing errors to Federal health care programs." (*Id.*)

Specifically, in instances where the physician ordered between 5 and 6 mcg. of Zemplar the clinic staff could at times obtain the full dose from a single 5 mcg. vial. Our billing system was at the time programmed to bill for Zemplar in 5 mcg. increments based on the Medicare HCPCS code available at the time. Therefore, if the clinician were able to obtain the full dose from one vial of Zemplar, the billing system would still bill the administration as 10 mcg. even though only one vial was used. The same issue arises if the physician ordered between 10 and 11 mcg., *since Zemplar is sold in 10 mcg vials as well and the overfill could have been used to complete the prescribed dose.* A June 25, 2002 memorandum directed the facilities to discontinue utilizing Zemplar overfill until billing software changes could be made.

(*Id.* at 12–13 (emphasis added) (footnote omitted).) In other words, Fresenius disclosed to OIG (through Caucci) that its clinics were utilizing and billing Medicare for Zemplar overfill, but at times, inadvertently billing for more than was actually administered. According to Caucci, this letter confirmed that Fresenius had disclosed that it was both using Zemplar overfill and billing the government for it, (Caucci Dep. at 67), and Caucci understood that Fresenius's overfill utilization policy would continue throughout the life of the CIA—through 2008—unless she was notified otherwise. (Caucci Dep. at 89.) Caucci did not indicate that Fresenius ever

notified her otherwise. (*See id.* at 147:20–25 "Q. Do you agree that Fresenius fully disclosed to you that it used and billed for Epogen and Zemplar overfill at all times from 2003 through [2008]? A. They did disclose to me that they were using and billing for overfill Epogen and Zemplar.") Under 31 U.S.C. § 3730(e)(4)(A), a disclosure in an "administrative ... report, hearing, audit, or investigation" is public, so Step 1 of the *Cooper* test is satisfied for all of Relator's claims involving both Epogen and Zemplar.[10]

**2. Disclosed information as the basis of Relator's suit**

■ Step 2 of the *Cooper* test asks whether the Relator's lawsuit is "based *in any part* on publicly disclosed information." *Battle*, 468 F.3d at 755 (emphasis added); *see also Cooper*, 19 F.3d at 567. Following the Tenth Circuit, the Eleventh Circuit has held that a claim is based in any part on a disclosure when the claim is merely "supported by" the disclosure. *Cooper*, 19 F.3d at 567 (citing *United States ex rel. Precision Co. v. Koch Ind.*, 971 F.2d 548, 552 (10th Cir.1992), *cert denied*, 507 U.S. 951, 113 S.Ct. 1364, 122 L.Ed.2d 742 (1993). A public disclosure need not "contain an allegation of wrongdoing," *Osheroff*, 776 F.3d at 814, but it must allege that the defendant "actually engaged in" conduct that was wrongful. *Cooper*, 19 F.3d at 567. The focus is on the facts, and where there is "significant overlap" between the allegations in the complaint and the public disclosures, the disclosures form the basis of the lawsuit. *Osheroff*, 776 F.3d at 814. Step 2 of the *Cooper* test is meant to be "a quick trigger to get to the more exacting original source

10. The Court's Order on the Parties' Cross Motions for Summary Judgment, issued on the date of this Order, details more fully the multiple public disclosures of Fresenius's billing of Medicare for Epogen and Zemplar overfill.

inquiry." *Id.* at 568 n. 10 (quoting *Precision Co.*, 971 F.2d at 552).

The Court previously found that Relator's lawsuit could not be "based on" the second amended complaint in *Woodard* because the second amended complaint alleged fraud based on a distinct theory of liability. (Doc. 57 at 16.) [11] *Osheroff* has since clarified that, at Step 2, the alleged theory of liability is less meaningful than the disclosed transactions. 776 F.3d at 814. The Court therefore revisits its previous analysis.

Under the quick trigger of Step 2, as interpreted anew in *Osheroff*, Epogen overfill billing was likely sufficiently disclosed in the *Woodard* second amended complaint. The allegations that Fresenius "combined the overfill from multiple vials to form additional doses of Epogen" and that those additional doses "were billed to Medicare," (Doc. 42–4 ¶ 56), likely overlap with the Epogen claims in this case in a significant enough way that they count under *Osheroff*'s analysis. 776 F.3d at 814. The *Woodard* second amended complaint also alleges that Epogen overfill billing continued until at least March 2005.

That date matters, because Relator persuasively argues that the Court should disregard any of the disclosures that pre-date CMS's the adoption of the Average Acquisition Cost methodology in January 1, 2005. This argument has some appeal, for a disclosure that a company is performing a legal activity does not obviously equate to a public disclosure that a company is *still* proceeding with that same activity *after* the activity becomes illegal. Common sense dictates that the initial disclo-

sure would be stale as of the change in the law, thereby requiring a new public disclosure that, yes, the company was still doing it even though the practice has become unlawful. *But see U.S. ex rel. Fine v. Sandia Corp.*, 70 F.3d 568, 571 (10th Cir. 1995) (holding that even though the government had not officially taken a position on the permissibility of the activity at the time it was disclosed, the public disclosures "sufficiently alerted the government to the likelihood that [the defendant] would [perform the practice] in the future," should the activity become illegal).

The disclosure timing issue is further complicated in this case, where the only obvious disclosure of billing Medicare for Zemplar overfill comes, essentially, from Fresenius's silence. Specifically, as described in detail above, Fresenius disclosed to the government, pursuant to the CIA, that it was billing for Zemplar overfill in 2003. And, pursuant to the government's understanding of the CIA, Fresenius would inform the government if it stopped billing for Zemplar overfill anytime before the CIA ended in 2008. So, according to Caucci, the OIG Associate Counsel assigned to monitor Fresenius's compliance with the CIA, the government understood or assumed that Fresenius was still billing for Zemplar overfill until sometime in 2008.

True, the purpose of the public disclosure bar is to "discourage opportunistic plaintiffs who have no significant information to contribute of their own," *Graham Cnty.*, 559 U.S. at 294, 130 S.Ct. 1396 (quotation omitted), and perhaps Fresenius's failure to affirmatively notify Caucci that Fresenius had stopped billing for

---

11. The Court nonetheless assumed for the sake of analysis that the lawsuit was based on the public disclosures and went on to find, based on the allegations in the Complaint, that Relator was an original source of the information. (*See* Doc. 57 at 15–17.)

Zemplar overfill was "sufficient to put the government on notice," *Fine*, 70 F.3d at 573, that Fresenius was in fact still billing Medicare for Zemplar overfill until the CIA concluded in 2008. The Court need not decide this issue, however. Out of an abundance of caution, and in deference to the broadest reading of *Osheroff* and the quick trigger that is Step 2 of the *Cooper* test, the Court assumes for the sake of analysis that this lawsuit was based in part on the Epogen overfill billing disclosures made in the *Woodard* second amended complaint and the Epogen and Zemplar overfill billing disclosures made in the course of the OIG investigation.

### 3. Original Source

■ The third and final—and more exacting—inquiry under the *Cooper* test is whether Relator was an original source of the information alleged. Relator's knowledge "must have been direct and independent for the [relator] to qualify as an original source." *Osheroff*, 776 F.3d at 814 (citing 31 U.S.C. § 3730(e)(4)(B)). Even if information is directly and independently obtained, "background information that helps one understand or contextualize a public disclosure is insufficient to grant original source status." *Id.* at 815 (citing *McElmurray*, 501 F.3d at 1254; *Cooper*, 19 F.3d at 568).

In *Cooper*, the relator, an employee of the defendant, was an original source because he acquired his information through years of experience in processing claims with Blue Cross Blue Shield of Florida. 19 F.3d at 568. Cooper's information was "potentially specific, direct evidence" of fraud and was "more than background information which enables him to understand the significance of a more general public disclosure." *Id.* at 568 n. 12.

In *McElmurray v. Consolidated Government of Augusta–Richmond County*, 501 F.3d 1244 (11th Cir.2007), on the other hand, the relators were not employees of the defendant. Rather, they were dairy farmers who were adversely affected by Augusta County's hazardous sewage sludge that they were convinced to use as fertilizer. The relators brought FCA claims against Augusta alleging that Augusta misrepresented its compliance with environmental laws in order to receive loans from the U.S. Environmental Protection Agency. The relators alleged that they "obtained the information on which they base[d] their complaint from publicly disclosed documents," *id.* at 1254, and made no showing that "they had knowledge independent of the publicly disclosed information as to the certifications alleged to be false." *Id.* The relators were not original sources "because they merely possessed background information about the defendants' environmental violations that allowed them to understand, based on public disclosures, that the defendants were committing fraud." *Osheroff*, 776 F.3d at 815 (citing *McElmurray*, 501 F.3d at 1254).

Finally, in *Osheroff*, the relator also was not an employee and also was not an original source. The relator there had done his own "market research" and his allegations substantially overlapped with information available in the public media. Those news media disclosures portrayed that "the clinics offered many free services to their patients," 776 F.3d at 815, and the relator's complaint included only "details re-lat[ed] to the value of the services offered, making it somewhat more plain that the clinics' programs could violate the [anti-kickback statute]." *Id.* For example, while the news media public disclosures described the clinic offering free food, trans-

portation, and haircuts, the details provided by the relator included the "type of food served for lunch, the destinations of some of the free transportation, [and] the frequency of salon services...." *Id.* The Eleventh Circuit held that the relator's additional details added mere background information at most, and that such background information was not alone sufficient to make him an original source.

■ This case is more like *Cooper* than *Osheroff* or *McElmurray*, and Relator—an employee of Defendant—has presented sufficient facts to convince the Court that he has direct and independent knowledge that provides more than mere background information. Chester Saldivar began working for Fresenius in April of 2007. Starting in August or so of 2007, Relator was in charge of ordering both Epogen and Zemplar for his two Fresenius clinics, and he also transferred orders to and between the clinics. He continued to perform this ordering and transferring function for both drugs until his termination in December 2009.

The same month Relator began ordering both drugs—approximately August of 2007—he was also assigned to report on Zemplar inventory. As part of doing the inventory, Relator personally counted the number of vials on hand at the beginning and end of the month, and personally filled out inventory forms containing this information and the number of doses administered that month. Relator performed this function for his two clinics' Zemplar inventory from August 2007 to December 2008,[12] and he filled out the vials-on-hand portion of similar forms for Epogen from August or September of 2009 until December 18, 2009, when Relator was terminated. And two of Relator's supervisors, Cesar Del Rosario and Aurora Alegre, told him that it was "very important" that he not make any mistakes in filling out the forms and getting the numbers correct, because the inventory "forms are the basis of billing Medicare." (Relator Dep. at 39:17–40:6; 83:22–84:9.)

Relator's allegations covered not only his actual knowledge, based on his job duties as Chief Technician at two labs, of billing Medicare for overfill, but also his personal familiarity, again as a result of his Chief Technician position, with Fresenius's national remuneration regime in which employees were both driven and incentivized by the head corporate office to maximize Fresenius's profit from the administration and billing of Epogen and Zemplar overfill. Relator had direct, independent evidence that Fresenius incentivized its employees as such and had direct, independent knowledge of the incentive structure through the reports he regularly received from corporate headquarters. The "Internal Memo" regarding "Monthly Scorecard and Leader Board—Measurements and Calculations" supplied by Defendant, while it is somewhat difficult to understand,[13] appears to confirm that clinics were ranked in part based on the "effi-

12. While Relator continued to fill out Zemplar forms after December 2008, Fresenius stopped billing for Zemplar overfill after that time, so the forms no longer contained an input space for that information.

13. The record indicates that Relator may have been slightly confused as to the precise way in which overfill factored into the calculations involved in Fresenius's bonus structure. Fresenius makes much ado about this. But Fresenius's argument is much ado about nothing as the record is sufficiently clear in any event that employees were given bonuses based on the efficient utilization of overfill.

ciency" of their Epogen and Zemplar utilization—*i.e.*, percentage of overfill extracted—as well as a ratios of supply cost, business overhead, and management fees to dialysis treatments delivered. (*See* Doc. 246–3.) All of these factors indicate that efficient utilization of overfill was factored into Fresenius's bonus structure.

Relator similarly testified that he participated in company discussions regarding maximizing the administration of overfill around the office, in clinical meetings, and in one-on-one conversations with managers. And because Relator was tasked with accounting for Epogen and Zemplar vials, he was shown monthly and quarterly reports "listing clinic performance nationwide in terms of overfill percentage for Epogen and Zemplar administered to patients." (Saldivar Decl. ¶ 10.) Taken together, all of the above leaves little doubt that Relator was an original source for his claims for at least some period of time. While Relator may not have actually filed any reimbursement forms with Medicare, (*id.* at 40:18–24), and may not have worked in the billing department, (*id.* at 68:5–9), Relator's first-hand experience filling out inventory forms which were used to bill Medicare, and his first-hand experience with Fresenius's national policies to maximize billing for utilization of overfill, is sufficient to constitute specific, direct, independent evidence of potential fraud. *See U.S. ex rel. Westfall v. Axiom Worldwide, Inc.*, No. 8:06–cv–571–T–33TBM, 2009 WL 764528, at *8 (M.D.Fla. Mar. 20, 2009) (holding that where "Relators were employees of these Defendants and were privy to confidential information about their practices," relators qualified as original sources); *U.S. ex rel. Merena v. Smithkline Beecham Corp.*, 114 F.Supp.2d 352, 357 (E.D.Pa.2000) (holding that an

employee relator "was what the cases and congressional history of the statute describe as the paradigmatic 'original source,' a 'whistleblowing insider' employee.") (citation omitted).

Defendant would have the Court disqualify Relator as an original source because he did not fill out the actual form that was submitted to Medicare, but only an inventory form on which the numbers in the actual Medicare reimbursement form were based. That exceedingly granular argument is unpersuasive. Relator was advised by two of his supervisors that the forms he personally filled out were used to bill Medicare—which was why it was so important that he get the information right. His direct relationship to the drug billing and utilization process is a far cry from the facts presented in cases cited by Defendants, where the relators' information came from Freedom of Information Act requests, *U.S. ex rel. Mistick PBT v. Hous. Auth. of City of Pittsburgh*, 186 F.3d 376, 389 (3d Cir.1999), or from interviews with employees of defendant companies, *In re Natural Gas Royalties*, 562 F.3d 1032, 1045–46 (10th Cir.2009), or where the Court had absolutely no information about how the relator garnered her information. *See U.S. ex rel. Schubert v. All Children's Health Sys., Inc.*, 941 F.Supp.2d 1332, 1336 (M.D.Fla.2013).

At the very least, Relator is an original source for at least some time period for both of the drugs at issue. While the precise time period or other factors could affect a damages calculation, it is clear that the Court has jurisdiction to hear claims related to the billing of Medicare for overfill in vials of both drugs. Accordingly, Defendant's Motion to Dismiss for lack of subject matter jurisdiction based on the Public Disclosure Bar is **DENIED**.

## B. First–to–File Bar

Defendant also argues that the Court lacks jurisdiction to hear Relator's claim due to the FCA's first-to-file rule. That rule states, "When a person brings an action under this subsection, no person other than the Government may intervene or bring a *related* action based on the facts underlying the *pending* action." 31 U.S.C. § 3730(b)(5) (emphasis added). While Defendant's Motion was pending, the U.S. Supreme Court held that an earlier-filed action "ceases to be 'pending' once it is dismissed." *Kellogg Brown & Root Serv., Inc. v. United States ex rel. Carter*, —— U.S. ——, 135 S.Ct. 1970, 1979, 191 L.Ed.2d 899 (2015). Under *Carter*, *Woodard* is the only action that was even possibly pending at the time Relator's Complaint was filed, so the Court's analysis will be confined accordingly.

### 1. Pending

Defendant argues that *Woodard* was indeed still pending at the time Relator's Complaint was filed because certain claims against other *Woodard* defendants were proceeding at that time—even though all claims against Fresenius had been dismissed. Relator argues that it is the dismissal of all claims against Fresenius that matters.

■■■ The U.S. Supreme Court recently held, in no uncertain terms, "[t]he FCA's first-to-file bar keeps new *claims* out of court only while related *claims* are still alive, not in perpetuity." *Carter*, 135 S.Ct. at 1972 (emphasis added). The word used was "claims"—not "actions" or "cases" or "suits." The Court noted that its holding otherwise would lead to "strange results that Congress is unlikely to have wanted ... [including barring] all subsequent re-lated suits even if that earlier suit was dismissed for a reason having nothing to do with the merits." *Id.* at 1979. The Court then asked, "Why would Congress want the abandonment of an earlier suit to [jurisdictionally] bar a later potentially successful suit that might result in a large recovery for the Government?" *Id.*

■■■ It wouldn't. Thus, when a defendant is dismissed from a qui tam suit, that action is no longer "pending" as against that defendant. Woodard abandoned his claims against Fresenius and voluntarily dismissed Fresenius from the lawsuit, with the Government's consent, in January 2010. Relator's original Complaint in this action was filed in March 2010. Accordingly, when Relator's complaint was filed, there was no action pending against Fresenius, so the first-to-file bar does not bar this suit.

### 2. Related

Even if *Woodard* were deemed still "pending" as against Fresenius, the Court also finds it unrelated. A second action is "related" if it is "based on the facts underlying the pending action." 31 U.S.C. § 3730(b)(5) The Eleventh Circuit's only explicit instruction on this prong of the first-to-file bar is "once one suit has been filed by a relator or by the government, all other suits against the same defendant based on the same kind of conduct would be barred." *Cooper*, 19 F.3d at 567; *see also U.S. ex rel. Powell v. Am. InterContinental Univ., Inc.*, No. 1:08–CV–2277–RWS, 2012 WL 2885356, at *9 (N.D.Ga. July 12, 2012). Other district and appellate courts have established more detailed tests under this prong, and "[t]he overwhelming majority of courts considering first-to-file issues have interpreted Section 3730(b)(5) to apply when a later-filed *qui*

*tam* complaint is based on either (1) the same 'type of fraud,' (2) the same 'essential elements' of fraud, or (3) the same 'material elements' of fraud." John T. Boese, Civil False Claims and *Qui Tam* Actions, 4–183–4–184 (2014–1 Supplement). At heart, courts recognize that the first-to-file bar was just another FCA mechanism intended "to promote incentives for whistle-blowing insiders and prevent opportunistic successive plaintiffs." *Makro Capital of Am., Inc. v. UBS AG,* 543 F.3d 1254, 1260 (11th Cir.2008) (quoting *United States ex rel. Lujan v. Hughes Aircraft Co.,* 243 F.3d 1181, 1187 (9th Cir.2001).)

A comparison of the second amended complaint in *Woodard* to Relator's Complaint makes clear that the actions are not related. *See In re Natural Gas Royalties Qui Tam Litig. (CO2 Appeals),* 566 F.3d 956, 964 (10th Cir.2009) ("The first-to-file bar is designed to be quickly and easily determinable, simply requiring a side-by-side comparison of the complaints.") There is only one sentence in *Woodard* averring Fresenius billed Medicare for Epogen overfill. The paragraph containing that sentence reads as follows:

> 54. Defendants' dialysis clinics soon learned that they could collect the overfill in the single-use vials and use it as a source of substantial amounts of "free" Epogen, which they could nevertheless bill to Medicare as though it came from new vials. However, the single-use vials are labeled as single-use and many states prohibit multiple entries into single use [sic] vials. Multiple entries into EPO single-use vials are considered "off-label" and violations of good medical practice.

(Doc. 42–4 at 21.) As is obvious from the remainder of the paragraph—and the rest of the second amended complaint—*Wood-*ard is not concerned with billing for overfill *per se.* *Woodard* is concerned with billing for overfill "*as though it came from new vials.*" (*Id.*) The essence of the relevant fraud alleged in *Woodard* was Fresenius certifying that it complied with Federal Drug Administration and state standard of care regulations—a condition for Medicare reimbursement—even though it was in fact impermissibly double-dipping into single-use vials in violation of "standard medical practice, state law, and Medicare conditions of coverage for such, which require use of medications according to their labels and consistent with good medical practice." (*Woodard* Second Amended Complaint, Doc. 42–4 ¶ 57.) It was immaterial to Woodard's claims whether Fresenius was retrieving overfill or only unused medication up to the amount labeled on the vial.

Here, on the other hand, Relator alleges a nationwide scheme of billing Medicare for administered Epogen and Zemplar overfill when Fresenius was not entitled to reimbursement for overfill after the adoption of the 2005 regulations. Relator's claims in this case do not involve express certification of compliance with state law or medical or medication practice standards. Thus, the "type of fraud" or the "essential elements" or the "material elements" of the fraud were not the same. Under *Cooper,* Relator does not allege the "same kind" of fraudulent conduct alleged in *Woodard.*

Accordingly, this case is not a "related action" under the material elements test. Thus, it is not "based on the facts underlying the pending action" such that the FCA's first-to-file bar applies. 31 U.S.C. § 3730(b)(5). And that assumes that the *Woodard* action is still "pending," which the Court has already rejected.

## IV. CONCLUSION

For the forgoing reasons, Defendant's Motion to Dismiss [Doc. 215] is **DENIED.**

**IT IS SO ORDERED** this 30th day of October, 2015.